# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 13, 2011 Session

## STATE OF TENNESSEE v. MARTY JOE KELLEY

### Appeal from the Circuit Court for Rutherford County
### No. F-62214    Robert E. Corlew, Judge

---

### No.  M2010-02318-CCA-R3-CD - Filed July 12, 2012

---

Appellant, Marty Joe Kelley, appeals after a lengthy jury trial during which a Rutherford County Jury convicted him of six counts of rape of a child, three counts of aggravated sexual battery, nine counts of rape without consent, twenty-five counts of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor.  Appellant was sentenced to an effective thirty-nine year sentence, to be served at 100%.  On appeal, Appellant argues: (1) the trial court improperly allowed the State to refer to the victim as "the victim" throughout the trial; (2) the State committed prosecutorial misconduct by referring to the victim as "the victim" throughout the trial; (3) the trial court improperly restricted defense counsel's opening statement; (4) the trial court improperly allowed a State's witness to remain unsequestered during trial; (5) the trial court erred by denying a mistrial; (6) the trial court improperly allowed the State's witness to display and explain a speculum during testimony about the physical examination of the victim; (7) the trial court erred by "repeatedly" allowing the State to introduce hearsay; (8) the trial court improperly charged the jury regarding the offenses of rape of a child and aggravated sexual battery; (9) the evidence was insufficient to support the convictions; (10) the trial court improperly enhanced Appellant's sentences; and (11) the trial court erred by imposing consecutive sentences.  After a thorough and complete review of the record and applicable authorities, we conclude: (1) Appellant waived any issue with regard to references to "the victim" during trial by failure to object; (2) the trial court did not abuse its discretion by prohibiting Appellant from reading a letter written by the victim to Appellant during opening statements where there was some confusion as to whether the State received the letter during discovery; (3) Appellant failed to show that the alleged prosecutorial misconduct alleged affected the verdict to the prejudice of Appellant; (4) Appellant waived any issue with respect to Detective Duke's remaining in the courtroom for failure to object, and, any error is harmless; (5) Appellant waived any review of whether the trial court should have granted a mistrial because he failed to seek a mistrial; (6) Appellant waived any complaint with respect to Hollye Gallion's testimony at trial for failure to object to the use of the speculum as demonstrative evidence, and, in the alternative, the trial court did not abuse its discretion; (7) Appellant waived most

of the hearsay issues for failure to object at trial; (8) the trial court did not err in admitting the testimony of Mr. Perry that the victim never told him about the abuse; (9) Appellant's sentences for rape of a child were improperly enhanced to twenty-three years because the trial court applied enhancement factors that were neither found by the jury nor admitted by Appellant; (10) the trial court properly ordered consecutive sentencing where Appellant was convicted of two of more offenses involving sexual abuse of a minor; (11) Appellant is not entitled to plain error review of the jury instructions; and (12) the State improperly elected facts for Count Five. Consequently, Appellant's conviction in Count Five for rape of a child is reversed and remanded for a new trial. Appellant's remaining sentences for rape of a child in Counts One, Two, Three, Four, and Six, are hereby modified to twenty years. Additionally, the trial court should enter a corrected judgment in Count Fifty and Fifty-eight to reflect Appellant's conviction as soliciting sexual exploitation of a minor. Accordingly, the judgments of the trial court are affirmed in part, reversed in part, modified in part, and remanded.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed in Part; Reversed in Part; Modified in Part and Remanded.

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

G. Jeff Cherry and David Veile, Lebanon, Tennessee, for the appellant, Marty Joe Kelley.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; William Whitesell, District Attorney General, and Laural A. Nutt Hemminway, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Factual Background*

On December 6, 2006, Appellant was indicted by the Rutherford County Grand Jury on six counts of rape of a child, three counts of aggravated sexual battery, nine counts of rape by force or coercion, nine counts of rape without consent, four counts of especially aggravated sexual exploitation of a minor, and two counts of exploitation of a minor by electronic means. The charges arose after a report was made by K.D.,[1] the victim, to her mother, the ex-girlfriend of Appellant and mother of his two other children, S.K. and T.K.

On November 3, 2008, a superseding indictment was issued by the Rutherford County Grand Jury charging Appellant with six counts of rape of a child, three counts of aggravated sexual battery, nine counts of rape without consent, nine counts of rape by force or coercion, twenty-eight counts of especially aggravated sexual exploitation of a minor, two counts of exploitation of a minor by electronic means, and one count of sexual exploitation of a minor.

The case proceeded to trial in November of 2008. At the time of trial, the victim was eighteen years old and a student at Community High School in Bedford County, Tennessee. She enrolled in that school in January of 2007 and was one of the top ten students in her class. The victim explained that her mother, C.D., and Appellant were in a relationship from the time that she was one year old. Appellant was not the victim's father.

The victim lived with her mother and Appellant in Nolensville, Tennessee from approximately the age of five to the age of nine when they moved to an apartment in Smyrna. Appellant owned a small company that provided escort services for funeral processions. Appellant owned several cars that looked similar to police cars and wore a uniform when he worked. In 1999, Appellant bought a house in Smyrna. The victim lived with Appellant at this house until December 3, 2006, with the exception of a few months sometime in 2003 when they lived in an apartment in Antioch while Appellant was performing some remodeling of the house in Smyrna. The victim's mother lived elsewhere, apart from the children and Appellant, for several years beginning sometime around the victim's twelfth birthday.

At trial, the victim testified to multiple incidents of sexual abuse by Appellant beginning from the time that she was five years old until she was removed from Appellant's home in December of 2006 at the age of sixteen. The victim denied initiating or desiring

---

[1] It is the policy of this Court to refer to minor victims of sexual abuse by their initials. In an attempt to further avoid identification of the victim, we will also refer to the victim's family members by their initials.

sexual contact with Appellant and insisted that she never gave him consent to have sexual contact with her at any time.

The victim recalled when she was five years old, Appellant had her lie naked on her stomach on Appellant's bed. Appellant would climb on top of her and place his penis between her body and the mattress. Appellant then started "humping" her body. Appellant's penis would be wrapped in toilet paper during these encounters. The victim remembered this type of encounter happening "tons of times," at least once during the day and multiple times at night. It "happened so often, anytime [the victim's] mother was gone, almost every day." Appellant repeated this encounter frequently until the victim was twelve years old. The first time it happened they were living in Nolensville, Tenenssee. It also happened when they lived at the "Country Village" apartment in Smyrna, Tennessee.

On the night that the victim's brother was born, Appellant insisted that the victim stay at home with him. On this particular occasion, Appellant and the victim were both naked. Appellant "went and got toilet paper and wrapped it around his penis, and he got on top of [the victim] and did that whole process until he ejaculated." When the victim was nine years old and lived in the house in Smyrna with her mother and Appellant, the victim recalled at least one incident where Appellant "climbed on top of [her] and humped [her] until [he] ejaculated."

Appellant first forced the victim to perform oral sex when she was eight-and-a-half years old. Appellant pushed her head onto his penis so that her lip was pressed against it. Appellant made her open her mouth. Appellant "put his penis in there . . . until he ejaculated" in her mouth. The victim recalled two or three times that Appellant forced her to perform oral sex at the apartment in Smyrna.

Appellant first attempted to have intercourse with the victim at the house in Smyrna when she was twelve years old about "two weeks after [her] first period." Appellant informed her, "If you're old enough to bleed, you're old enough to breed." Appellant undressed the victim and pushed her onto the bed, got on top of her and "used his hand down there." Appellant was "going up and down . . . and his penis kept pushing on [her] vagina." The victim recalled that "[his penis] wouldn't go . . . [i]t was just pushing and pushing like something too big going into a smaller hole, trying to get in." The victim cried and told Appellant that it was going to hurt and that she did not want to do it anymore. Appellant told her to stop crying and told the victim, "You're mine." Appellant eventually gave up because he was frustrated.

About one week later, Appellant attempted intercourse again. This time, when the victim started crying, Appellant slapped her and told her to "shut up." Appellant pushed the

victim out of the bed, into the living room, and onto the couch. Appellant told the victim again to stop crying because she was "ruining it."

Appellant forced the victim to perform oral sex when the victim was twelve years old. Appellant removed his clothes and made the victim get on her knees. Appellant pushed the victim's head toward his penis repeatedly, "harder and harder" to ensure that the victim would open her mouth. Finally, Appellant got his penis into her mouth and "started going back and forth." The victim started crying. Appellant eventually stopped and said, "Forget this, we're going to try to . . . have sex."

At that time, Appellant pushed the victim onto the bed and tried to have sex with her by pushing his penis against her vagina. The victim testified that this hurt. Appellant "kept going for about two hours, until he finally ejaculated."

At some point when she was twelve years old, just before they moved into the apartment in Antioch, the victim tried to tell her mother about the sexual abuse. The victim told her mother that she did not want Appellant to go to jail because she did not want to break up their family. Up to this point, the victim had been afraid to tell anyone because Appellant had told her that he would kill her mother if she told anyone. After the victim told her mother of the abuse, they had a plan to move out of the apartment, but Appellant would not let them move.

Shortly thereafter, Appellant and the victim's mother got into a violent domestic dispute. During the argument, C.D. confronted Appellant about the abuse, and Appellant pointed a handgun at C.D. The victim claimed that Appellant forced her to tell her mother that the allegations were a lie.

After that time, Appellant finished the remodeling of the house in Smyrna and moved himself, the victim, and his other two children back into the house in Smyrna. C.D. did not move into the house with Appellant and the children. Appellant became the sole caretaker of the children from this time forward up until his arrest. The victim referred to Appellant as "Dad" after they moved into the house without her mother. The victim even recalled Appellant talking to an attorney about legally adopting and gaining sole custody of her along with her younger brother and sister. About two weeks after Appellant moved the children into the house without their mother, the victim wrote a letter to Appellant. The victim explained that she wrote the letter to attempt to make Appellant feel more like a father figure. She hoped that it would deter him from repeating the sexual abuse.

After they moved into the house in Smyrna without her mother, the victim had to repeat the seventh grade because she had missed too many days of school. She explained that

she was forced to miss school to babysit her younger sister. Then, in 2004, Appellant decided to homeschool the children. Appellant did not force them to do their school work. Appellant ordered books for homeschooling. The victim tried to teach her younger brother, but he would not listen to her about school. Appellant submitted grades for the children online. Appellant did not have a GED or high school diploma.

The victim's mother visited infrequently; and when she did visit, Appellant did not allow the victim and her mother to be alone together.

The house Appellant lived in with the victim and the two other children in Smyrna had three bedrooms. At first, the victim and her younger sister shared a bedroom. Her younger brother often slept in Appellant's room. Appellant tried to have sex with her one time while her younger brother was asleep in the bed. At some point after they moved back into the house without the victim's mother, Appellant decided that everyone would sleep in his room in his bed.

Two weeks after moving back into the house, Appellant made the victim come to his bedroom and "get naked" before he tried to have intercourse with her by putting his penis on her vagina and "pushing on it." By this time, the victim was thirteen years of age.

Another time at the house in Smyrna, Appellant came into the victim's bedroom, grabbed her breast, took off her clothing, and laid on top of her. When the victim started crying, Appellant slapped her in the face. The victim's younger sister was asleep in the room at the time.

Appellant tried to have intercourse with Appellant another time by pushing her onto the bed, putting his penis on her vagina and "just pushing against it."

One time when the victim was sixteen, at the house in Smyrna, Appellant "tried to do intercourse." When the victim started crying, Appellant tried to "choke" her. The very next day, Appellant tried to "do intercourse" with her again. This time, Appellant "did it for about two hours, until he finally ejaculated." The victim stated that Appellant's penis did not "go very much in [to her vagina], if it did at all."

The victim described another incident at the house in Smyrna where Appellant tried to have sex with her on the couch. The victim explained that she frequently tensed up her legs "to hope that that would stop [his penis] from going in" because she "didn't want him to take [her] virginity."

On yet another occasion, the victim recalled Appellant telling her to take a bath because he wanted to "do oral." Appellant pulled the victim onto the bed, but the victim closed her legs. Appellant opened her legs, held them open, and "started licking [her] vagina."

Appellant performed oral sex on the victim on another occasion in his bedroom. The victim started crying when Appellant's tongue touched her vagina. Appellant then climbed on top of the victim and pushed his penis on the outside of her vagina.

Appellant also took pictures of the victim with his digital camera and webcam.[2] According to the victim, Appellant created a Yahoo! account under a fake name for the victim when she was fourteen years old. Appellant would then find "guys on the internet that was [sic] younger and he would start talking to them as if he were this 18-year-old-girl." Appellant would engage in "perverted, explicit" conversations with people online. Appellant then started taking off the victim's clothing and exposing parts of her body to people online using a webcam. Appellant used the victim's laptop computer for these activities.

The victim recalled one incident in particular when she was fourteen years old and Appellant took off her shirt and showed her breasts on the webcam. Appellant also took off the victim's pants and underwear to expose Appellant's nude body on the webcam.

The victim testified that another incident occurred when she was fifteen years old. On this occasion, Appellant used the Yahoo! account to expose the victim's breasts to others over the internet. Appellant took off the victim's shirt and bra and told her to "flash" the webcam. The victim denied that she ever voluntarily exposed her "breasts or private area" over the internet.

The victim claimed that Appellant also took pictures of her with a digital camera. The victim claimed that she was unable to take pictures of herself with the camera and did not know if the camera had a timer function. The pictures were introduced at trial. They showed the victim topless on Appellant's bed as well as completely nude. In total, the State introduced twenty-seven nude and partially nude photographs of the victim that were taken prior to the victim's eighteenth birthday. The victim was asked why she was smiling in some of the pictures and testified that Appellant told her he would make her have sex with him if she refused to smile in the pictures. The victim testified that she did take pictures of herself with a cell phone camera by using a mirror. These included at least one picture in which the

---

[2] The State also introduced a videotape that Appellant took of the victim when she was seven years old. The tape showed the victim in a bath towel and in a nightgown.

victim was wearing a towel. The victim explained that she was wearing clothing under the towel and took the picture in order to see what her hair looked like that day. The victim saved these pictures to her computer but claimed that she never sent them to anyone over the internet. This picture was also introduced at trial.

The victim admitted that she had her own various internet chat identifications and engaged in online chatroom conversations with other people from time to time. She also had a "MySpace" web page. In particular, the victim maintained an online relationship of sorts with a boy named Torin Brown from Michigan. This friendship lasted for about nine years. Mr. Brown testified at trial that he frequently communicated with the victim using instant messenger. He stated that he never received any nude pictures of the victim. The victim denied ever engaging in explicit sexual conversations online with other people. The victim also claimed that Appellant knew her various passwords.

The victim testified about the last day that she was living with Appellant. The victim was on the computer chatting with an online friend when Appellant entered the room and grabbed her breasts. She pushed Appellant away, and he hit her in the face. The victim continued to resist and Appellant hit her again, becoming even more angry before leaving the room. Appellant came back into the room, took the victim's laptop and cell phone and placed them into a filing cabinet in his closet.

Later that day, Appellant took the children to Mrs. Winner's restaurant to meet their mother. While they were at the counter ordering their food, the victim's younger sister told her mother that Appellant had hit the victim. The victim went to the bathroom with her mother and told her about what happened earlier that day at the house.

When the victim and her mother left the restroom, the victim's mother informed Appellant that she needed to make a phone call outside the restaurant. When she walked outside, Appellant questioned the victim about the conversation that took place in the bathroom.

C.D. left the restaurant, telling Appellant that she was headed to K-Mart. In reality, she called the police. Appellant, the victim, and her two siblings left the restaurant and went to Appellant's parents' home. The police came shortly thereafter to bring Appellant in for questioning. The victim confirmed to police that she reported the abuse to her mother and asked her mother to call the police. Appellant was later arrested for domestic assault.

After Appellant was arrested, the victim was taken to the police station and questioned by Detective Jeffery Duke. The victim gave an initial statement to the officer who drove her to the police department and gave a more detailed statement later that evening to Detective

Duke. He also interviewed the victim's siblings. He concluded that the victim had "no reason to lie" and was a "good girl" who made "good grades." Appellant told Detective Duke that C.D. "put [the victim] up to this [so that she could get] custody." The victim gave several other statements to police during the course of the investigation.

After speaking with Detective Duke, the victim spent some time in the office of Alisha Graham, the community services coordinator for the Smyrna Police Department. The victim used Ms. Graham's computer to change her computer passwords. Additionally, the victim spent some time chatting with an online friend that she had been chatting with earlier in the day.

The victim was taken back home by Detective Duke and Ms. Graham in order to retrieve some of her belongings. The victim got clothes for herself and her siblings. She also retrieved her laptop and cell phone. When they returned to the police department, the victim was able to show the police the pictures on the computer. She also signed a release for the laptop. The victim and her siblings went to live at her mother's parents' house when they left the police station.

After the victim went to the police with her allegations, she was taken to "Our Kids" center in Nashville for examination by a pediatric nurse practitioner, Hollye Gallion. During the examination, the victim reported that Appellant touched her vagina, breasts, and butt with his hands and mouth. The victim also alleged that Appellant touched her vagina with his penis by pushing "against her vagina trying to make it go in."

Gallion performed a vaginal exam on the victim by inserting a speculum about an inch to an inch and a half into the victim's vagina. During part of her testimony, Gallion displayed the speculum and explained how it was used during the exam. The results of the exam were normal. However, Gallion explained that it was possible for a female to have sex on multiple occasions without any physical evidence or injury to the hymen.

During the investigation, the laptop computer owned by the victim and a desktop computer seized from Appellant's home were turned over the Tennessee Bureau of Investigation ("TBI"). They were analyzed by Douglas Williams, a special agent for the TBI. There was nothing of importance found on the desktop computer. The twenty-eight photographs of the victim were found on the victim's laptop computer.

The victim's brother, S.K., testified at trial. At the time of trial, he was in the fourth grade and lived with his mother. S.K. recalled living at Appellant's house in Smyrna where all of the siblings slept in the room with Appellant. S.K. confirmed the victim's testimony that Appellant homeschooled the children but did not actually teach them anything.

S.K. saw Appellant using a webcam on the victim when she was wearing a bikini. S.K. thought that Appellant was doing this in order to show the victim's body to other people. He remembered seeing Appellant do this "a lot."

S.K. also recalled seeing Appellant "get up top of" the victim while wearing no clothing. S.K. saw Appellant hit the victim one time when she was unclothed.

C.D., the victim's mother, testified at trial. She had a twelve-year relationship with Appellant and was the mother of S.K. and T.K., the victim's younger siblings. She started dating Appellant when she was seventeen. The victim was one year old at that time. During the relationship with Appellant, C.D. was a dancer/stripper in Nashville and made anywhere from $200 to $600 a night. C.D. claimed that Appellant took her children away and threatened violence on numerous occasions. C.D. recalled that the victim told her about sexual abuse for the first time when she was around fourteen years of age. C.D. stated that she questioned Appellant about the allegations of sexual abuse but that Appellant denied any abuse. Appellant had placed a gun to C.D.'s head during an argument and threatened to kill her.

C.D. admitted that she had a conviction for possession of cocaine with the intent to sell. She explained that she was selling cocaine to try to get enough money to hire an attorney to get custody of her children. She explained that she was never able to hire the attorney because she blew most of the money on cars.

Appellant did not testify at trial. He called various witnesses to testify regarding his reputation and his relationship with his children and the victim. Tara Kelley, Appellant's niece, testified that she actually lived with Appellant until she was thirteen years old. Appellant is sixteen years older than she is and never made inappropriate advances toward her in a sexual way.

Several other people, including one of Appellant's employees, a D.A.R.E. officer at the victim's school, and a neighbor testified that they never heard the victim express any concerns about her relationship with Appellant.

Appellant's sister, Tamara Perry, also testified at trial. She recalled that the victim had friends and would spend time with them without Appellant being present. She stated that she never saw Appellant being physically abusive to C.D. or the victim. Ms. Perry testified that she gave the victim money for her birthday to purchase a digital camera.

Ms. Perry remembered that Appellant had talked to an attorney about custody of the children partially because their mother had been absent for about four years. Attorney Sandra

Jones confirmed Ms. Perry's memory. Ms. Jones visited with Appellant in June of 2003 to discuss filing a petition to establish his parentage of the two youngest children. During this meeting, Ms. Jones claimed that the victim expressed a desire to be adopted by Appellant. Ms. Jones did not file the petition for parentage until after the children had been removed from Appellant's custody. She was told by the trial court that she could not proceed on the petition or with a custody matter until the allegations of sexual abuse had been resolved.

Appellant presented James Wilson of Net Evidence Incorporated to testify regarding the hard drive on the victim's laptop computer. Specifically, Mr. Wilson testified that the image in exhibit 39, showing the victim in a towel with wet hair, was used in connection with a messenger program. This file was deleted on December 3, 2006 at 8:58 p.m. Mr. Wilson confirmed that there was some texting activity during the early morning hours and also around noon on December 3, 2006.

During his examination of the laptop computer, Mr. Wilson discovered that 237 files and pictures were deleted from the laptop between December 3 and December 8 of 2006. He made this determination on the basis of the internal clock on the computer. At that time, the laptop was in the possession of the police department.

At the conclusion of all the proof and lengthy trial, the jury convicted Appellant of the following: child rape in Counts One through Six; aggravated sexual battery in Counts Seven through Nine; rape by force or coercion in Counts Ten through Eighteen; especially aggravated sexual exploitation of a minor in Counts Thirty-one through Thirty-four, Thirty-six through Thirty-nine, Forty-one through Forty-four, Forty-nine, Fifty, Fifty-one, Fifty-three, Fifty-four, and Fifty-six; and soliciting sexual exploitation of a minor in Counts Fifty-seven and Fifty-eight.[3] Counts Nineteen through Twenty-seven were dismissed as alternative charges. Appellant was found not guilty of sexual exploitation of a minor in Count Twenty-eight; not guilty of especially aggravated sexual exploitation of a minor in Counts Twenty-nine, Thirty, Thirty-five, Forty, Forty-five through Forty-eight, Fifty-two, and Fifty-five.

After a sentencing hearing, Appellant was sentenced to twenty-three years for Counts One through Six and eight years on each other Count. Counts One through Six were ordered to be served concurrently with each other. Counts Seven through Nine were ordered to be served concurrently with each other but consecutively to Counts One through Six. Counts Ten through Eighteen were ordered to be served concurrently with each other but consecutively to counts One through Six and Seven through Nine. Counts Thirty-one

---

[3] The judgment form in Count fifty-eight incorrectly states that Appellant was convicted of sexual exploitation of a minor. It should indicate that Appellant was convicted of soliciting sexual exploitation of a minor. On remand, the trial court should enter a corrected judgment to reflect the proper conviction.

through Thirty-four, Thirty-six through Thirty-nine, Forty-one through Forty-four, Forty-nine through Fifty-one, Fifty-three, Fifty-four, and Fifty-six through Fifty-eight were ordered to be served concurrently with each other but consecutively to Counts One through Seven. Appellant's total effective sentence is thirty-nine years at 100% incarceration.

After the denial of a motion for new trial, Appellant filed a timely notice of appeal. On appeal, he raises multiple allegations of error.

*Analysis*

*References to "the victim" at Trial*

First, Appellant argues that the trial court erred when it allowed the State to refer to the victim as "the victim" during its opening statement and later throughout trial. Specifically, Appellant insists that whether the victim was actually a "victim" was an issue to be determined by the jury. The State alleges that Appellant has waived the issue by failing to object. In the alternative, the State argues that Appellant failed to demonstrate that the State's reference to K.D. as "the victim" prejudiced the verdict.

Prior to trial, counsel for Appellant expressed some concern that the State would reference the victim as "the victim" at trial and asked the trial court to prohibit the State from doing so. The trial court recognized Appellant's concern but declined to require the State to use the phrase "alleged victim." The trial court encouraged counsel for Appellant to raise the issue at trial "if [the term "victim" was] emphasized or used with frequency." At that point, the trial court stated that it would hear "defense" on the issue.

During opening statements, counsel for the State referred to K.D. as "the victim" on at least sixteen occasions. Despite the trial court's invitation to hear the defense on this issue should it arise at trial, there was no objection by counsel for Appellant.

We agree with the State that Appellant has waived this issue by failing to make a contemporaneous objection to the prosecutor's remarks at trial. *See, e.g.*, *State v. Everett D. Cain*, No. 02-C-01-9504-CR-00104, 1996 WL 417672 , at *3 (Tenn. Crim. App., at Jackson, July 26, 1996), *perm. app. denied* (Tenn. Feb. 3, 1997) (stating that "[t]he failure to make a contemporaneous objection when the assistant district attorney general made the comment during his opening statement constituted a waiver of this issue" and citing Tenn. R. App. P. 36(a); *State v. Dondie Tidwell*, No. M2000-2628-CCA-R3-CD, 2002 WL 31852861 (Tenn. Crim. App., at Nashville, Dec. 18, 2002) (determining that defendant waived complaints about improper remarks in the opening statement by failing to object and failing to show prejudice); *see also State v. McPherson*, 882 S.W.2d 365, 373 (Tenn. Crim. App. 1994);

*State v. Gregory*, 862 S.W.2d 574, 578 (Tenn. Crim. App. 1993); and *State v. Thomas*, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991)). Moreover, assuming that the prosecutor's remarks were improper, Appellant has also failed to show how he was prejudiced by those remarks, and he is charged with proving prejudice in order for this Court to grant his requested relief. *See State v. Bigbee*, 885 S .W.2d 797, 809 (Tenn. 1994) (instructing that when a prosecutor makes improper remarks during a closing argument, the appellate court must determine "whether the impropriety affected the verdict to the prejudice of the defendant"). Finally, Appellant is not entitled to plain error review of the issue.[4] Tenn. R. App. P. 36(b). When determining whether plain error review is appropriate, the following five factors must be established:

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice."

*State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted)). Herein, Appellant has not shown that the failure to object was not a tactical move by counsel or that a clear and unequivocal rule of law was breached.

*Limitations on Appellant's Opening Statement*

Appellant argues on appeal that the trial court improperly restricted Appellant's opening statement. Specifically, Appellant complains that the trial court prohibited him from reading portions of a letter during opening statements. The letter was written by the victim to Appellant. Appellant believes that the trial court's prohibition coupled with the State's later admission of the letter into evidence "prejudiced [Appellant] by compromising defense counsel's credibility with the jury." The State insists that the trial court properly precluded counsel for Appellant from reading the letter because it was inadmissible hearsay. Additionally, the State points out that the letter was subsequently admitted by the State, without objection from the defense, thereby making Appellant's argument moot.

In the case herein, during opening statements, counsel for Appellant started to read a letter written by the victim to Appellant. Counsel for the State objected, claiming that the

___

[4] Effective July 1, 2009, Tennessee Rule of Criminal Procedure 52 was deleted in its entirety, and the plain error language was added to Rule 36(b).

State had not received the letter during discovery. Counsel for Appellant insisted that the letter was submitted during discovery. The trial court agreed to let counsel for Appellant "reference the letter" during opening statements but "denied" any attempt to read from the letter during opening statements "in light of the . . . circumstances that . . . [arose]." Counsel for Appellant informed the trial court that they would "wait to introduce the entire letter until the trial" but intended to "summarize that the letter expresses her appreciation [of Appellant]." The State objected. The trial court sustained the objection and commented that those issues would be dealt with when they came up at trial. Opening statements resumed, and counsel for Appellant commented that "[the victim] wrote a very nice letter to [Appellant]." Later, during the trial, the State actually introduced the letter as part of the victim's testimony.

Opening statements "are intended merely to inform the trial judge and jury, in a general way, of the nature of the case and to outline, generally, the facts each party intends to prove." *Harris v. Baptist Mem'l Hosp.*, 574 S.W.2d 730, 732 (Tenn. 1978). A trial court should provide both parties the opportunity to present their case theory and the facts upon which they intend to rely, so long as those facts are deemed likely to be supported by admissible evidence. *See State v. Stout*, 46 S.W.3d 689, 713 (Tenn. 2001). "Trial courts have wide discretion in controlling arguments of counsel, including opening statements, and a trial court's ruling concerning the arguments of counsel will not be reversed absent an abuse of discretion." *State v. Stacy Johnson*, No. W2004-00464-CCA-R3-CD, 2005 WL 645165, at *15 (Tenn. Crim. App., at Jackson, Mar. 15, 2005) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). After looking at the record, we do not find an abuse of discretion by the trial court in prohibiting Appellant, during the opening statement, from reading directly from a letter written by the victim to Appellant when it was unclear whether the letter was disclosed to the State prior to trial in discovery and whether the letter was admissible in evidence. Moreover, when the letter was ultimately introduced by the State, Appellant failed to object. Appellant is precluded from arguing prejudice from this action in the absence of an objection. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Moreover, the contents of the letter were ultimately made known to the jury. Therefore, Appellant has failed to demonstrate prejudice from this alleged error.

*Prosecutorial Misconduct*

Next, Appellant makes various claims of prosecutorial misconduct and urges this Court to grant him a new trial on the basis of actions of the State. Specifically, Appellant insists that the State: (1) failed to disclose exculpatory evidence; (2) suggested during opening statements that certain witnesses may not testify; (3) referred to photographs as

pornography in front of the jury; and (4) referred to the victim as "the victim" during opening statements and throughout the trial.[5]  The State, on the other hand, contends that the record does not indicate any misconduct and that Appellant has failed to show that any conduct of the State affected the verdict to the prejudice of Appellant.

When a defendant makes allegations of prosecutorial misconduct, on appeal, this Court reviews the record to see "whether such conduct could have affected the verdict to the prejudice of the defendant." *State v. Smith*, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). In other words, it will be reversible error if the improper comments of the prosecutor were so improper or the argument so inflammatory that it affected the verdict. *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005); *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). This court must consider the following five factors on appeal:

> "(1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case."

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see also State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003); *State v. Jeffrey Mark Klocko*, No. M2006-01359-CCA-R3-CD, 2008 WL 2743692 (Tenn. Crim. App., at Nashville, Jun. 16, 2008), *perm. app. denied* (Tenn. Dec. 22, 2008).

### A.  Exculpatory Evidence

First, Appellant claims that the State refused to disclose exculpatory evidence that was contained in the videotaped interview of the victim with Detective Duke.  In a pretrial motions hearing, counsel for the State informed the trial court that she had viewed the tape and did not believe there was exculpatory evidence on the tape.  The trial court reviewed the tape in chambers and determined that it contained statements by the victim that indicated that "no penetration" occurred and, therefore, contained exculpatory evidence.  The trial court ruled in favor of Appellant, and he received a copy of the tape.  We fail to see how this conduct "affected the verdict to the prejudice of the defendant." *Smith*, 803 S.W.2d at 710. Appellant received the evidence that he was seeking.  This issue is without merit.

---

[5]We have already determined that this issue was waived for failure to object.

*B. Comments Regarding Witness Testimony*

Next, Appellant argues that suggestions made by the State in opening argument that the other children in the home may not "be able to testify" amounted to prosecutorial misconduct. Counsel for Appellant objected, arguing that any suggestion that witnesses "can't testify" was "highly improper." Appellant argues that the comment was meant to "elicit sympathy" for the other children in the household and was prejudicial.

We disagree. Appellant is unable to show prejudice. Ultimately, the State called S.K., one of the other children in the household, to testify. This issue is without merit.

*C. Reference to Images as Pornography*

Lastly, Appellant claims that the State made a reference to pornography during a discussion of the admissibility of some photographs. Prior to trial, there was some discussion as to whether Appellant had exposed the victim to pornography during the course of her childhood. The trial court ruled that any references to pornography found in Appellant's home would be excluded unless there was testimony from the victim that she had been exposed to pornography by Appellant. During trial, prior to the introduction of several photographs, counsel for both parties reviewed the photographs at the bench out of hearing of the jury while the jury was still in the courtroom. Counsel for Appellant objected to a few of the photographs. The State replied, "[W]ell, any particular one identified [as objectionable]? We have pornography that has been brought up." At that point, counsel for Appellant objected and asked for a jury-out hearing. The remainder of the discussion occurred after the jury was removed from the courtroom. At the conclusion of the jury-out hearing, the trial court sustained Appellant's objection. The trial court determined that none of the charges at issue dealt with any of the pornography that may have been found in the home during the execution of the search warrant and that any reference thereto was, therefore, irrelevant.

Appellant has failed to show that the passing reference to pornography by counsel for the State during a bench conference out of hearing of the jury was improper or was "so improper" that it "affected the verdict." *Reid*, 164 S.W.3d at 344. This issue is without merit.

*Detective Duke's Presence in Courtroom During Trial*

Appellant insists that the trial court failed to follow Rule 615 of the Tennessee Rules of Evidence by allowing Detective Duke to remain unsequestered during trial. Appellant claims that Detective Duke was thereby able to tailor his testimony to that of the victim,

resulting in prejudice to Appellant. The State, on the other hand, insists that Appellant waived the issue for failure to object and that, in any event, Appellant was not prejudiced by Detective Duke remaining in the courtroom during the trial.

Rule 615 of the Tennessee Rules of Evidence states, in pertinent part, that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." Additionally:

> This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

Tenn. R. Evid. 615. "The rule" may be invoked at any time and is mandatory. *State v. Anthony*, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). Rule 615 provides for three exceptions. Under subsection (2), the state is permitted to designate a representative. In *State v. Wingard*, 891 S.W.2d 628 (Tenn. Crim. App. 1994), this Court held that the prison warden was the chief official at the correctional facility and a participant in the search for the defendant and therefore qualified as the state's designated representative or "prosecutor" in the case. As such, the witness was allowed to testify in rebuttal even though he had not been excluded from the courtroom during the previous testimony. *Id.* at 635. Trial judges have always been afforded wide discretion in determining whether to impose the sanction of excluding the evidence of the witness suspected of having violated the rule. *State v. Moffett*, 729 S.W.2d 679, 681 (Tenn. Crim. App. 1986); *see also State v. Anthony*, 836 S.W.2d 600, 604-05 (Tenn. Crim. App. 1992).

Appellant herein did not allege at the trial that Detective Duke's presence violated Rule 615, did not object to any of Detective Duke's testimony on the basis of Rule 615, and did not request a hearing to determine whether a violation of Rule 615 occurred or caused prejudice to Appellant. As a result, Appellant has waived this issue. *See* Tenn. R. App. P. 36(a); *see also State v. Don Siddall*, No. E2009-02348-CCA-R3-CD, 2010 WL 534463, at *6 (Tenn. Crim. App., at Knoxville, Dec. 22, 2010); *State v. Jimmy Dale Picket*, No. M2005-02434-CCA-R3-CD, 2007 WL 471136, at *3-4 (Tenn. Crim. App., at Nashville, Feb. 14, 2007) (stating that although the appellant invoked Rule 615 at the start of the trial, he waived any violation of that rule on appeal because he "never alleged at trial that the witnesses violated the Rule, never objected to any of the witnesses' testimony, and never requested a jury-out hearing to determine the facts of the violation or prejudice to the appellant.").

*Failure to Declare a Mistrial*

Appellant complains that the trial court failed to sua sponte declare a mistrial after two witnesses, C.D. and Nancy Nelson, a social worker, testified that S.K. was "scared" of Appellant. The State insists that Appellant opened the door to the testimony and, moreover, has waived any complaint by failing to request a mistrial or a curative instruction.

During the testimony of the victim's mother, C.D., the following exchange occurred:

Counsel for STATE: And what kinds of clothes would [Appellant] wear when he - - for work purposes?

C.D.: A uniform that looked like a police uniform with a badge on it, and he usually always wore his belt with his gun on it.

Counsel for STATE: Okay. So he looked like a police officer?

C.D. Yes.

Counsel for STATE: So would you be surprised that perhaps [S.K.] didn't want to talk to the other police officers since his dad looked like a police officer?

Counsel for APPELLANT: Judge, I'm going to object.

C.D.: That could have been it, but - -

TRIAL COURT: Sustained.

Counsel for APPELLANT: Objection.

Counsel for STATE: Now, you were asked about [S.K.'s] - - his - - I guess it was phrased "wanting to please people" or that sort of thing. Were you with him after he testified in court?

C.D. The other day?

Counsel for STATE: Yes.

C.D.                           Yes.

Counsel for STATE:             And what was his reaction?

C.D.                           He was really freaking out.  He was crying and scared to death.

Counsel for STATE:             And that was after he testified?

C.D.                           Yeah.

Counsel for STATE:             And when you say he was - - "He was crying and scared to death," what was he doing with his body?

C.D.                           He went and locked his [sic] self in the bathroom.

Counsel for STATE:             Okay.  And anything else that you recall about that?

C.D.                           Well, before he went to the bathroom, he laid on the floor and he was kind of trying to hide.  And he had his head like this (gesturing).  And I kept saying, "What's wrong, baby? What's wrong baby?" And he was just really upset and really scared.

Counsel for STATE:             And did he talk to you about whether he told the truth in court?

Counsel for APPELLANT:         Judge, objection.

C.D.                           Yes.  He said - -

Counsel for APPELLANT:         - - objection, objection.

TRIAL COURT:                   Sustained.

Counsel for State:             You did have a conversation with him about  - - and you did tell him to tell the truth in court?

-19-

| | |
|---|---|
| C.D. | Yes. |
| Counsel for STATE: | And after you talked to him, is it your belief that he did tell the truth in court? |
| Counsel for APPELLANT: | Judge, objection. |
| TRIAL COURT: | Sustained. |
| Counsel for APPELLANT: | Judge, objection. |
| TRIAL COURT: | Sustained. Further questions, General. |
| Counsel for STATE: | Did you tell him to do anything when he testified except tell the truth? |
| C.D. | No. |
| Counsel for STATE: | Do you any reason to believe he did not tell the truth? |
| C.D. | I don't know what was said in here, but he told me that he - - |
| Counsel for APPELLANT: | Judge, objection. |
| TRIAL COURT: | Sustained. |
| Counsel for STATE: | Do you have any reason? |
| TRIAL COURT: | Sustained. |
| C.D. | No. |
| TRIAL COURT: | Sustained. Strike please from your consideration the answer. Further questions. |

Later, after the testimony of Nancy Nelson, a social worker, the jury submitted several questions. Among those was a query as to whether Ms. Nelson ever interviewed S.K. In response to the question she stated that he was "in our office . . . very afraid." There was no

objection by counsel for Appellant to Ms. Nelson's comment. Appellant argues on appeal that these "improper" comments warranted a mistrial.

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. *See Arnold v. State*, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *State v. Millbrooks*, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (citing *State v. Hall*, 667 S.W.2d 507, 510 (Tenn. Crim. App. 1983)). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. *See State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996).

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting *Jones v. State*, 403 S.W.2d 750, 753 (Tenn. 1966)). Only when there is "no feasible alternative to halting the proceedings" can a manifest necessity be shown. *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981).

Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this Court has considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction.[6] *See State v. Demetrius Holmes*, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999).

Of course, a defendant "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequences of his own neglect or misconduct." *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (quoting *Norris v. Richards*, 246 S.W.2d 81, 85 (Tenn. 1952)) (quotation marks omitted). To that end, "[i]f a party fails to request a curative instruction, or if dissatisfied

_____

[6] These factors are non-exclusive and may not be pertinent in every case. *State v. William Dotson*, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999); *see Mounce*, 859 S.W.2d at 322 (holding that determination of propriety of mistrial is not subject to mechanistic determination and should be made on the facts of each individual case).

with the instruction given and does not request a more complete instruction, the party effectively waives the issue for appellate purposes." *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997). Furthermore, failure to request a mistrial waives any further action by the trial court. *State v. Hall*, 976 S.W.2d 121, 157 (Tenn. 1998).

In the case herein, Appellant objected to several of the questions posed to C.D. The trial court sustained the objections and gave the jury the instruction to disregard C.D.'s answers. Appellant did not seek a further curative instruction or a mistrial. Accordingly, we conclude that any complaint about the lack of a further instruction to the jury or the trial court's failure to declare a mistrial has been waived.

*Use of Speculum During Testimony*

Appellant argues on appeal that the trial court erred by allowing Hollye Gallion, the nurse practitioner who performed the physical examination of the victim, to show the jury a speculum during her testimony to describe the physical examination process. The State insists that Appellant waived the issue for failure to object and, in any event, the testimony was relevant.

As we begin our analysis, we note well-established precedent providing that trial courts have broad discretion in determining the admissibility of some evidence, and their rulings on issues of relevance will not be reversed absent an abuse of that discretion. *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Moreover, the Tennessee Rules of Evidence embody, and our courts traditionally have acknowledged, "a policy of liberality in the admission of evidence in both civil and criminal cases." *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *see also State v. Robinson*, 930 S.W.2d 78, 84 (Tenn. Crim. App. 1995). To be admissible, evidence must satisfy the threshold determination of relevancy mandated by Rule 401 of the Tennessee Rules of Evidence. *See, e.g., Banks*, 564 S.W.2d at 949. Rule 401 defines "relevant evidence" as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant "evidence may be excluded if its probative value is substantially outweighed by . . . the danger of unfair prejudice." Tenn. R. Evid. 403; *see also Banks*, 564 S.W.2d at 951. The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Advisory Committee Cmts.).

The admission of demonstrative evidence is within the sound discretion of the trial court. *State v. West*, 767 S.W.2d 387 (Tenn. 1989); *State v. Delk*, 692 S.W.2d 431 (Tenn. Crim. App. 1985); *State v. Wiseman*, 643 S.W.2d 354, 365 (Tenn. Crim. App. 1982).

In our view, the trial court did not abuse its discretion in allowing Ms. Gallion to utilize the speculum to describe the anogenital exam that was performed on the victim. During her testimony, she held the speculum for the jury to see and explained how it was inserted into the victim's vagina to allow her to "see the cervix in the back of the vagina and collect swabs for sexually-transmitted infection screening" and also allowed for images to be taken of the anogenital exam. There was no objection to the testimony or the use of the medical instrument to describe the exam. As stated previously, a defendant's failure to make a contemporaneous objection during trial typically constitutes a waiver of an issue. Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a); *State v. Cravens*, 764 S.W.2d 754, 757 (Tenn. 1989). After a review of the record, we agree with the State. Appellant made no objection during the testimony. Therefore, he cannot successfully raise this issue on appeal. Moreover, we determine that the trial court did not abuse its discretion in allowing the witness to utilize the medical instrument during her testimony as it was certainly relevant to the explanation of the exam during which it was established that there was no physical evidence establishing that the victim had been sexually abused. If anything this evidence was favorable to Appellant. This issue is without merit.

*Hearsay*

Appellant complains of several different instances during the trial wherein he claims the trial court erroneously allowed the State to introduce hearsay statements that were prejudicial. The State insists that Appellant's consistent failure to object to statements or, in the alternative, request curative measures after the alleged hearsay, results in a waiver of the issues on appeal.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay statements are generally not allowed into evidence. Tenn. R. Evid. 802. However, the Tennessee Rules of Evidence provide for exceptions to the hearsay rule. *See* Tenn. R. Evid. 803 & 804. These exceptions have been carved out because they "bear sufficient indicia of reliability and trustworthiness to warrant admission." *State v. Henry*, 33 S.W.3d 797, 802 (Tenn. 2000).

Appellant complains on appeal about the following statements: (1) testimony from C.D. regarding statements made by the victim that Appellant "won't stop" abusing the victim and was "trying to mess with [the victim];" (2) testimony from David Parkerson, a school principal, about information he received from Lynn Nolten, one of his elementary school counselors, who had talked on the phone with someone who informed her that there was a restraining order out on Appellant; (3) an unsworn out-of-court statement made by the victim to Ryan Perry in which the victim told Mr. Perry that the "reason [Appellant] was arrested

was true;" (4) testimony from Detective Duke that the victim told him that the laptop computer belonged to her; (5) Torin Brown's testimony that the victim told him through computer chat that Appellant threatened to kill her if she went to police and that there were "naked pictures" of her on the computers taken by Appellant; and (6) Appellant's sister's testimony about whether the victim had ever told her that Appellant put a gun to her mother's head after a heated argument.

During the trial, Appellant only objected to one of these instances of which he now complains, the testimony of Mr. Perry. With respect to the objection made during the testimony of Mr. Perry, we find no error. The following occurred at trial: One of the questions submitted by the jurors at the conclusion of Mr. Perry's testimony was whether the victim ever told Mr. Perry about the abuse. He stated that she had not. Later, during re-direct examination, counsel for the State asked Mr. Perry if the victim had contacted him after Appellant's arrest. Counsel for Appellant objected on the basis of hearsay. In a jury-out hearing, Mr. Perry testified that the victim sent him an instant message on the computer in which she "told [him the allegations were] true and that she could not talk about it." This statement seemingly contradicted Mr. Perry's earlier testimony in which he claimed that the victim had never told him of the abuse. At the conclusion of the jury-out hearing, the trial court lamented that "any ruling . . . is subject to being in error" and discussed both what the outcome could be if the objection was sustained or overruled. In the end, the trial court chose to overrule the objection. When the jury was called back into the courtroom, the re-direct examination of Mr. Perry continued, and he testified that he "asked [the victim after Appellant was arrested] if why [Appellant] was arrested was true and she stated yes, and that was it" but that "[s]he never told [him] about any abuse." This testimony was not offered for the truth of the matter asserted but rather to rebut the defense challenge to the victim's credibility. The trial court did not abuse its discretion in admitting the testimony.

With respect to the other instances, as stated above, this Court has no obligation to grant relief "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Our supreme court has mandated that when "a party does not object to the admissibility of evidence, . . . the evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary, and the jury may consider that evidence for its 'natural probative effects as if it were in law admissible.'" *State v. Smith*, 24 S.W.3d 274, 280 (Tenn. 2000) (quoting *State v. Harrington*, 627 S.W.2d 345, 348 (Tenn. 1981)). Accordingly, we find no error was committed, and any consideration of whether the hearsay statements submitted at trial could have been inadmissible hearsay is waived for failure to object to the testimony at trial. *See* Tenn. R. App. P. 36(a). This issue is without merit.

Appellant claims that the evidence is insufficient to support the convictions for rape of a child in Counts One, Two, Five, and Six. Specifically, Appellant claims that the State relied on three occurrences of "attempted intercourse" from the year that the victim was twelve to satisfy five separate acts. Appellant insists that the victim testified as to the fact that Appellant "tried" to have sex with her and that the medical evidence did not support penetration. Therefore, Appellant argues that the evidence was insufficient. Additionally, Appellant contends that the State made a "gross error during its election of offenses by misleading the jury by misstating the evidence." Appellant claims that the State elected only five events "and simply relied upon the same facts for Count 6 as . . . used for Count 5!" The State disagrees, insisting that the victim "testified about six distinct incidents of rape that occurred when she was under the age of sixteen." In other words, the election was appropriate, and the evidence was sufficient to support the convictions.

The requirement of election and a jury unanimity instruction exists even though Appellant has not requested them. *See Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). Rather, it is incumbent upon the trial court, even absent a request from the defendant, to ensure that the State properly makes an election in order to avoid a "'patchwork verdict' based on different offenses in evidence." *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. 1993). Moreover, failure to follow the procedures is considered an error of constitutional magnitude and will result in reversal of the conviction, absent the error being harmless beyond a reasonable doubt. *See State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000); *see also Shelton*, 851 S.W.2d at 138.

The election requirement was first adopted in this state in *Jamison v. State*, 94 S.W. 675 (Tenn. 1906). In *Jamison*, the Tennessee Supreme Court held that proof of all sexual acts allegedly committed by the defendant against the victim could be admitted into evidence, but to avoid the prosecution of uncharged sex crimes, the State was required to elect the specific act upon which it was relying to obtain a guilty verdict. *Id.* at 676. Since that time, the election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are often unable to identify the exact date on which any one act was perpetrated. *See, e.g., State v. Brown*, 992 S.W.2d 389 (Tenn. 1999) (finding that the trial court erred in failing to require an election when the defendant was charged with rape of a child in a one count indictment that covered a six-month time frame, but the proof showed that at least ten instances of digital penetration occurred during the six months alleged, five occurring on one day and five others on different days); *State v. Walton*, 958 S.W.2d 724 (Tenn. 1997) (finding an election should have been required where sexual offenses were charged in a multi-count, open-ended indictment and where the child

victim testified she was raped by the defendant or that he performed cunnilingus on her on a daily basis for over a year); *Burlison*, 501 S.W.2d at 804 (finding an election should have been required where the defendant was charged with having "carnal knowledge" of the victim on "diverse days between the summer of 1964 and August, 1969," but the proof did not show any particular date).

In 1994 however, *Jamison* was overruled to the extent it had established an exception to sex crimes that permitted proof of all sexual acts allegedly committed by the defendant against the victim, whether charged or uncharged. *See State v. Rickman*, 876 S.W.2d 824, 829 (Tenn. 1994) (overruling *Jamison*). In *Rickman*, the court recognized that indictments often charge general time frames that encompass several months and, in those circumstances, the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction. *Id.* In fact, "it [is] the duty of the trial judge to require the State, at the close of its proof-in-chief, to elect the particular offense of carnal knowledge upon which it would rely for conviction, and to properly instruct the jury so that the verdict of every juror would be united on the one offense." *Burlison*, 501 S.W.2d at 804.

Our supreme court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed more offenses than those charged. *See State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *Brown*, 992 S.W.2d at 391; *Walton*, 958 S.W.2d at 727; *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996); *Shelton*, 851 S.W.2d at 137. The requirement of election serves several purposes: (1) it enables the defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. *Brown*, 992 S.W.2d at 391.

Appellant complains that the State improperly elected offenses in Counts One, Two, Five, and Six. At the outset, we note that Appellant failed to raise this issue in a motion for new trial. However, election of offenses is an issue which is rooted in a criminal defendant's fundamental constitutional rights and is, therefore, subject to plain error review, irrespective of whether it was raised in a motion for new trial. *See State v. Kendrick*, 38 S.W.3d 566, 567

(Tenn. 2001) (reversing convictions as plain error for State's failure to elect offenses, even though the issue was not addressed in the direct appeal).[7]

The counts of the indictment at issue in the case herein were for the offense of rape of a child. Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7).

From the record, it is clear that the State introduced multiple instances of offenses that were committed against the victim, necessitating an election of offenses prior to jury deliberations. Further, it is clear that during closing arguments, counsel for the State stated the following with regard to the factual basis for each of the six counts of rape of a child:

Count No. 1: [The victim] told you that she was 12 years old when she got her first menstrual cycle. About two weeks after her first cycle, defendant attempted intercourse, told her that if she was "old enough to bleed, she was old enough to breed."

. . . .

In the second count [the victim] told you that she was 12 years old. There was not much time between this time and the first time, in Count 1. The defendant attempted intercourse. She told him, "No," but he kept pushing against her vaginal opening. He pushed her out of the bed and into the living room where she screamed. He slapped her, covered her mouth with his hand, and he told her to stop crying because she was ruining it.

Count No. 3 of rape of a child: [The victim] told you that when she was still 12, but was getting close to 13, the defendant told her to get on her knees. He pushed his penis into her mouth. It hurt her lips. He made her perform oral sex on him until he ejaculated. . . .

---

[7]We find it noteworthy that in addressing the election issues in *Kendrick* the court did not find it necessary to undertake the typical analysis for plain error claims as set forth in *State v. Adkisson*, 899 S.W.2d 626 (Tenn. 1994), in order to determine whether the State's failure to properly elect offenses constituted plain error. We will follow suit in the case herein.

Count No. 4: [The victim] was less than 13 years old. The defendant - - the defendant pushed her on her knees onto his penis. He pushed his penis into her mouth. He made her perform oral sex on him until he ejaculated in her - - in her mouth. And this was a separate time than in Count 3.

Count 5: [The victim] was less than 13 years old. The information in the count - - in this count immediately followed what happened in Count 4. the defendant tried to push his penis into her vagina. [The victim] cried, and the defendant slapped her.

Count No. 6: [The victim] was less than 13 years old. This count relates to the event after the oral sex described in Count 3. After the oral sex, the defendant pushed [the victim] to the bed, got on top of her, tried to push his penis into her vagina very hard. It hurt [the victim]. The defendant tried until he ejaculated. Then he told her to squirt water inside of her to keep from getting pregnant.

During the charge to the jury, the trial court did not provide a specific description of the elected offenses.[8]

Again, Appellant claims that the State's description of the elected offenses in Counts One, Two, Five, and Six, did not sufficiently correspond to the proof and that those convictions must therefore be reversed.

In Count One, the State relied upon the testimony of the victim wherein Appellant attempted intercourse two weeks after her first period and told her if she was old enough to "bleed" she was old enough to "breed." The victim's testimony corresponds with the State's election on this Count.

In Count Two, the State elected to rely on the occasion when Appellant attempted intercourse in the bed and eventually pushed the victim into the living room where she screamed. The victim's testimony corresponds with the State's election on this count.

---

[8] In our review, we were unable to locate within the record the jury charge that was submitted to the jury prior to deliberation. The transcript contains the charge as read to the jury by the trial court. In that charge, the trial court merely stated that Counts One through Six alleged a violation of Tennessee Code Annotated section 39-13-522, which makes it "unlawful for any person to engage in unlawful sexual penetration of a victim by the defendant where the victim is between the ages of 3 and 13."

In Count Three, the State elected to rely on events that occurred when the victim was still twelve wherein Appellant forced the victim to her knees and made her fellate him until he ejaculated. According to the testimony of the victim, an incident like this occurred. Appellant made the victim get on her knees in front of the bed and perform fellatio on him. The victim, however, did not state that Appellant ejaculated, instead, the victim claimed, as elected by the State in Count Six, that Appellant pushed her onto the bed and tried to have intercourse with her. The victim turned her head so as to not to let Appellant see her cry. Appellant attempted intercourse for about two hours, until he ejaculated. He then brought the victim a water bottle and told her to squirt water inside her vagina to avoid pregnancy. This testimony corresponds to the election in Counts Three and Six. While the testimony of the victim does not indicate, as alleged by the State, that Appellant ejaculated in Count Three, the jury had proof that matched the elected offenses in all respects except whether Appellant ejaculated after fellatio, a detail which, under the circumstances of the case, is trivial. Additionally, it was not necessary for the State to prove that Appellant ejaculated to sustain a conviction for rape of a child. The State's election as to Counts Three and Six was proper.

In Count Four, the State elected events when Appellant pushed the victim to her knees and made her perform oral sex on him until he ejaculated in her mouth. The victim testified to events that occurred when she was eight-and-a-half that correspond to this testimony, separately from the testimony that the State used in Count Three.

In Count Five, the State claimed that this count "related to the event after the oral sex described in Count 3." While there is testimony from the victim that on one occasion, Appellant tried to have intercourse with her while she was on her back lying down. She started to cry, claiming that it would "hurt." During this instance, Appellant "insisted" that he was going to take her "virginity" because the victim "owe[d] it to him." Then Appellant "slapped" her, eventually getting frustrated and quitting. Afterward, the victim got up and took a bath. The victim did not testify that this occurred after Appellant forced her to perform oral sex, as the State claimed in its election. The failure of the State to properly elect an offense upon which to seek a conviction for the rape charge in Count Five failed to ensure that the jury would focus on one offense and reach an unanimous verdict with respect to this count.

The remedy for improper election is the reversal of the conviction, absent the error being harmless beyond a reasonable doubt. *Shelton*, 851 S.W.2d at 138. We are compelled to agree with another panel of this Court, placed in a similar position, "that the results of cases such as this are all the more tragic because they are easily preventable." *State v. Kenneth Lee Herring*, No. M1999-00776-CCA-R3-CD, 2000 WL 1208311, at *8 (Tenn. Crim. App., at Nashville, August 24, 2000) (reversing and remanding for retrial five convictions for rape of a child based on the State's failure to make a proper election of

-29-

offenses). Thus, we conclude that Appellant's conviction for rape of a child in Count Five must be reversed and remanded for a new trial.[9]

*Jury Instructions*

Appellant argues next on appeal that the trial court improperly instructed the jury on rape of a child and aggravated sexual battery. Specifically, Appellant complains that the inclusion of reckless conduct as an element of child rape and aggravated sexual battery was erroneous and lessened the State's burden or proof. Appellant acknowledges that he failed to object to the instructions at trial and seeks plain error review of the issue. The State, on the other hand, asserts that the trial court properly instructed the jury and, in any event, Appellant is not entitled to plain error review.

As noted previously, generally when determining whether plain error review is appropriate, the following five factors must be established: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused [must not have waived] the issue for tactical reasons; and (e) consideration of the error [must be] "necessary to do substantial justice." *State v. Terry*, 118 S.W.3d 355, 360 (Tenn. 2003) (quoting *Adkisson*, 899 S.W.2d at 641-42 (footnotes omitted)).

To begin our analysis we must examine whether a clear and unequivocal rule of law has been breached. A trial court has a "duty to give a complete charge of the law applicable to the facts of the case." *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). Anything short of a complete charge denies a defendant his constitutional right to trial by a jury. *State v. McAfee*, 737 S.W.2d 304, 308 (Tenn. Crim. App. 1987). However, Tennessee law does not mandate that any particular jury instructions be given so long as the trial court gives a complete charge on the applicable law. *See State v. West*, 844 S.W.2d 144, 151 (Tenn. 1992). A charge is prejudicial error "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Forbes*, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995); *Graham v. State*, 547 S.W.2d 531 (Tenn. 1977)). In determining whether jury instructions are erroneous, this Court must review the charge in its entirety and invalidate the charge only if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law. *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998). Erroneous jury instructions

---

[9]We note that the trial court ordered consecutive sentencing on the basis that Appellant was convicted of two or more offenses involving the sexual abuse of a minor. Our reversal of one of these convictions does not necessitate a remand for resentencing of the others. Appellant still stands convicted of multiple offenses that support the trial court's determination that consecutive sentencing was warranted.

require a reversal, unless the error is harmless beyond a reasonable doubt. *See Welch v. State*, 836 S.W.2d 586, 590 (Tenn. Crim. App. 1992).

The four culpable mental states in Tennessee are intentional, knowing, reckless, and criminal negligence. *See* T.C.A. § 39-11-302. Often, the statute defining an offense will state the culpable mental state. *State v. Page*, 81 S.W.3d 781, 786 (Tenn. Crim. App. 2002). If it does not, then "intent, knowledge or recklessness suffices." T.C.A. § 39-11-301(c). "Each of these mental states is defined with reference to two or three of the following possible conduct elements: (1) nature of defendant's conduct, (2) circumstances surrounding the defendant's conduct, and (3) result of the defendant's conduct." *Page*, 81 S.W.3d at 787 (citing T.C.A. § 39-11-302). In *State v. Howard*, 926 S.W.2d 579, 586 (Tenn. Crim. App. 1996), this Court stated that "[w]hen an offense has different mens rea for separate elements, the trial court must set forth the mental state for each element clearly so that the jury can determine whether the state has met its burden of proof."

In the case herein, the trial court instructed the jury with the following definitions:

"Intentionally" means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious obligation [sic] or desire to engage in the conduct or cause the result.

"Knowingly" means that a person acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exists [sic]. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

"Recklessly" means that a person acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its regard constitutes a gross - - I'm sorry, that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all of the circumstances as viewed from the accused person's standpoint.

The trial court went on to instruct the jury as to rape of a child in Counts One through Six as follows:

[T]he State must have proven beyond a reasonable doubt the existence of the following essential elements: That the defendant had unlawful sexual penetration of the victim or the alleged victim had unlawful sexual penetration of the defendant; and that the alleged victim was more than three years of age, but less than 13 years of age; and that the defendant acted either intentionally, knowingly, or recklessly.

The trial court instructed the jury that, in order to find Appellant guilty of aggravated sexual battery:

[T]he State must have proven beyond a reasonable doubt the existence of the following essential elements: That the defendant had unlawful sexual contact with the alleged victim in which the defendant intentionally touched the alleged victim's intimate parts, or the clothing covering the intimate area of the alleged victim's intimate parts; and the alleged victim was less than 13 years of age; and that the defendant acted either intentionally, knowingly, or recklessly.

On appeal, Appellant cites a 2006 opinion from this Court, *State v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920 (Tenn. Crim. App., at Nashville, Nov. 29, 2006), to support his argument that the trial court erroneously instructed the jury that a defendant must act "intentionally, knowingly, or recklessly" in order to commit rape of a child. *Charles L. Williams*, 2006 WL 3431920, at *28.

There appears to be a split of authority in this Court about whether recklessness is a culpable mental state for rape of a child and aggravated sexual battery. This Court released *Charles L. Williams*, in 2006, in which the authoring judge reviewed jury instructions for recklessness but found that they were in error. In *Charles L. Williams*, the two non-authoring judges dissented from the conclusion that the instructions were in error but concurred in the result, which reversed the defendant's convictions and remanded for a new trial. 2006 WL 3431920, at *28.

In contrast is *State v. Chester Wayne Walters*, No. M2003-03019-CCA-R3-CD, 2004 WL 2726034 (Tenn. Crim. App., at Nashville, Nov. 30, 2004), *perm. app. denied* (Tenn. Mar. 21, 2005), in which a panel of this Court found no error in a set of rape of a child jury instructions identical to those issued in this case. *Chester Wayne Walters*, 2004 WL 2726034, at *12-14. The decision in *Chester Wayne Walters* has been followed by several other decisions issued by this Court. *See, e.g., State v. Patrick Wayne Tripp*, No. M2009-01203-CCA-R3-CD, 2010 WL 4054314, at *25-26 (Tenn. Crim. App., at Nashville, Oct. 15, 2010); *State v. Joel E. Blanton*, No. M2007-01384-CCA-R3-CD, 2009 WL 537558,

at *13 (Tenn. Crim. App., at Nashville, Mar. 9, 2009), *perm. app. denied* (Tenn. Aug. 24, 2009) (determining that defendant was not entitled to plain error review where the trial court instructed the jury that the mental states of intentional, knowing, and reckless satisfied the mens rea for each element of rape of a child); *State v. Frederick Leon Tucker*, No. M2005-00839-CCA-R3-CD, 2006 WL 5547991, at *13 (Tenn. Crim. App., at Nashville, Mar. 7, 2006) (holding that rape of a child instructions that did not include a specific mental state but included definitions of intentionally, knowingly, and recklessly "fairly defined the issues of the law and did not mislead the jury").

Therefore, the trial court did not breach a "clear and unequivocal rule of law." We therefore decline to review this issue as plain error.

In a related argument, also not raised in the motion for a new trial, Appellant insists that the jury instructions "that the mental state for [rape of a child and] aggravated sexual battery could be proved by the State in the disjunctive . . . [was] a violation of [Appellant's] . . . rights to a jury trial and the right to a unanimous verdict." It is true that "[a] defendant has the fundamental constitutional right under Tennessee law to a unanimous verdict before a conviction for a criminal offense may be imposed.*" State v. James Clayton Young*, Jr., No. 01C01-9605-CC-00208, 1998 WL 258466, at *5 (Tenn. Crim. App., at Nashville, May 22, 1998) (citing *State v. Shelton*, 851 S.W.2d 134, 137 (Tenn. Crim. App. 1993)). "Protection of this right may require special precautions by the trial court to ensure that the jury does not reach a 'patchwork verdict' based on different offenses." *Id.* (citing *State v. Forbes*, 918 S.W.2d 431, 445-46 (Tenn. Crim. App. 1995)). However, this Court has stated, "Generally, alternative theories, mental states, modes of committing the crime, or means by which the crime was committed may be submitted to the jury without the necessity of precautions to assure jury unanimity." *Young*, 1998 WL 258466, at *5 n.4. In fact, in *State v. Hood*, 221 S.W.3d 531 (Tenn. Ct. App. 2006), the Court of Appeals addressed unanimous jury verdicts in the context of multiple culpable mental states. 221 S.W.3d at 547. The court specifically determined that the use of the word "or" when listing the alternative culpable mental states for the offense of aggravated rape did not violate constitutional protections against non-unanimous jury verdicts. *Id.* at 547-48. This same analysis was applied to instructions on rape of a child and aggravated sexual battery in *Joel E. Blanton*, 2009 WL 537558, at *15. Consequently, we conclude that the trial court did not violate Appellant's right to a unanimous jury verdict herein when it instructed the jury on intentional, knowing, and reckless mental states with respect to rape of a child and aggravated sexual battery. Thus, there was no plain error, and, as such, Appellant is not entitled to relief on this issue.

*Sentencing*

Appellant claims that the trial court improperly enhanced his convictions in violation of *Blakely v. Washington*, 542 U.S. 296 (2004). The State agrees, submitting that because Appellant was to be sentenced according to the law prior to the 2005 amendments to the Tennessee Sentencing Act, he was entitled to the presumptive sentence of twenty years for the convictions for rape of a child.

When an accused challenges the length and manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. *State v. Butler*, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); *State v. Smith*, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); *State v. Bonestel*, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a de novo review of a sentence, we must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 4-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2009); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The trial court in this case sentenced Appellant in March of 2009 for acts that were committed prior to 2006, at a time when Tennessee sentencing law was undergoing changes as a result of several recent U.S. Supreme Court decisions. In 2004, the U.S. Supreme Court held in *Blakely* that the elevation of a defendant's sentence above the "prescribed statutory maximum" based upon anything other than the fact of a prior conviction violates the defendant's right to a jury trial. 532 U.S. at 301. In 2005, in *State v. Gomez*, 163 S.W.3d 632 (Tenn. 2005) ("*Gomez I*"), the Tennessee Supreme Court held that the Tennessee Criminal Sentencing Reform Act of 1989 did not run afoul of *Blakely*. 163 S.W.3d at 654-62. In response, the Legislature enacted the 2005 Sentencing Reform Act, which complied with *Blakely* by eradicating presumptive sentences and establishing advisory sentencing

guidelines, with the changes taking effect on June 7, 2005. In 2007, the U.S. Supreme Court held that California's sentencing code, which was very similar to Tennessee's 1989 Sentencing Reform Act, violated the defendant's right to a jury trial, as defined in *Blakely*. *See Cunningham v. California*, 549 U.S. 270, 293 (2007). Then, in *State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007) ("*Gomez II*"), the Tennessee Supreme Court held, in response to *Cunningham*, that, to the extent Tennessee's 1989 Sentencing Reform Act permitted elevation of a presumptive sentence based upon judicially-determined facts other than the fact of an admission or a prior conviction, it violated the defendant's right to a jury trial. 239 S.W.3d at 741.

Consequently, this Court has held that a defendant who committed his crime before July 1, 2005, may either be sentenced under the 1989 Criminal Sentencing Reform Act and in accordance with *Blakely* and *Gomez II*, or he may sign an "ex-post facto waiver," which allows the trial court to sentence him under the 2005 Sentencing Reform Act. *See State v. Saint*, 284 S.W.3d 340, 347 (Tenn. Crim. App. 2008). If no ex post facto waiver is filed and a defendant is sentenced under the 1989 Act, a trial court may not enhance a defendant's sentence above the presumptive minimum based upon factors, other than a defendant's prior convictions, that are not admitted by the defendant or found by a jury beyond a reasonable doubt. *Id.*

In the case herein, Appellant committed the crimes at issue, rape of a child, prior to the 2005 amendments to the Act. Appellant was sentenced in May of 2006. There is no ex post facto waiver in the record; thus, Appellant was subject to sentencing under the 1989 Criminal Sentencing Act in accordance with *Blakely* and *Gomez II*.

The 1989 Criminal Sentencing Reform Act required the trial court to begin its determination of the appropriate sentence with a "presumptive sentence." T.C.A. § 40-35-210(c) (Supp. 2001). For Class A felonies, the presumptive sentence is the midpoint of the appropriate range for the offense. *Id.*

Appellant was sentenced as a Range I, Standard offender. Rape of a child, a Class A felony, has a sentence range of fifteen to twenty-five years. T.C.A. § 39-13-502(b). The presumptive sentence for rape of a child is twenty years. *Id*. § 40-35-210(c) (Supp. 2001). As the State concedes because of the error in sentencing, Appellant's sentences must be reduced to the presumptive term of twenty years.

*Consecutive Sentencing*

Appellant also challenges the imposition of consecutive sentences. A trial court may impose consecutive sentences upon a determination that one or more of the criteria set forth

in Tennessee Code Annotated section 40-35-115(b) exists. This section permits the trial court to impose consecutive sentences if the court finds, among other criteria, that:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b). When imposing a consecutive sentence, a trial court should also consider general sentencing principles, which include whether or not the length of a sentence is justly deserved in relation to the seriousness of the offense. *See State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002). The imposition of consecutive sentencing is in the discretion of the trial court. *See State v. Adams*, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997).

Appellant was convicted of six counts of rape of a child, three counts of aggravated sexual battery, nine counts of rape without consent, twenty-five counts of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor. The trial court based the imposition of consecutive sentencing on Tennessee Code Annotated

section 40-35-115(b)(5), more than two convictions of offenses involving child sexual abuse. After making it clear that the trial court had considered the evidence at trial and sentencing as well as the presentence report, the principles of sentencing, the nature and characteristics of the criminal conduct involved, the mitigating factors, sentencing practices in Tennessee, the Appellant's statements on his presentence report and the potential for rehabilitation, the trial court made the following statement with regard to consecutive sentencing:

> And in that regard we have considered that [Appellant], of course, has been convicted of a number of offenses. We have considered then the extent to which the record does show the number of convictions here in this indictment. We have considered also to the extent shown by the evidence in this case that [Appellant], in the commission of these offenses, demonstrated behavior with -- with little or no regard for the victim in each of these charges. We have considered also that [Appellant] has been convicted of two or more statutory offenses. That's the language in the statute, two or more statutory offenses involving sexual abuse of a minor, with consideration then that statute provides consideration of aggravating circumstances arising from the relationship between the defendant and the victim, the time span of the defendant's undetected sexual activity, the nature and the scope of the sexual acts, the extent of the residual physical and mental damage to the victim or victims. And the Court has considered those factors to the extent that it is shown by the testimony presented both today and at the trial.

The trial court then ordered Appellant to serve twenty-three years each for Counts One through Six and eight years on each other Count. Counts One through Six were ordered to be served concurrently with each other. Counts Seven through Nine were ordered to be served concurrently with each other but consecutively to Counts One through Six. Counts Ten through Eighteen were ordered to be served concurrently with each other but consecutively to counts One through Six and Seven through Nine. Counts Thirty-one through Thirty-four, Thirty-six through Thirty-nine, Forty-one through Forty-four, Forty-nine through Fifty-one, Fifty-three, Fifty-four, and Fifty-six through Fifty-eight were ordered to be served concurrently with each other but consecutively to Counts One through Seven. In our review, we determine that the trial court herein thoroughly and completely considered the criteria of Tennessee Code Annotated section 40-35-115(b)(5) prior to the imposition of consecutive sentences and stated those reasons on the record. The trial court took time to examine each criteria and related it to the facts of the case. The trial court did not abuse its discretion. This issue is without merit.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed in part, reversed in part, modified in part, and remanded. Appellant's conviction for rape of a child in Count Five is reversed and remanded for a new trial. On remand, Appellant's remaining judgments for rape of child should be modified to reflect a sentence of twenty years, the midpoint in the range for a Class A felony. Finally, the trial court should enter a corrected judgment in Count Fifty and Fifty-eight to reflect Appellant's conviction as soliciting sexual exploitation of a minor.

_____
JERRY L. SMITH, JUDGE